FILED
2006 Dec-11  AM 08:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

FILED
2006 DEC -8  PM 4:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| E.A. RENFROE & COMPANY, INC., | }
| | }
| Plaintiff, | }
| | }
| v. | } CIVIL ACTION NO.
| | } 06-AR-1752-S
| CORI RIGSBY MORAN and KERRI | }
| RIGSBY, | }
| | }
| Defendants. | }

ENTERED
DEC 8 2006

## MEMORANDUM OPINION AND PRELIMINARY INJUNCTION

On November 21, 2006, an evidentiary hearing was conducted on the application of plaintiff, E.A. Renfroe & Company, Inc. ("Renfroe"), for a preliminary injunction against defendants, Cori Rigsby Moran ("Moran"), and Kerri Rigsby ("Rigsby"). Neither Moran nor Rigsby appeared in person at the hearing, but they were both represented by counsel.

The basic facts bearing on Renfroe's request for preliminary injunctive relief are, for the most part, undisputed. Renfroe is a company that provides adjusters to insurance companies during catastrophes. Moran and Rigsby had worked for Renfroe on disasters before Hurricane Katrina, and in the wake of Katrina they were called upon by Renfroe to perform services in Mississippi in fulfillment of a contract with State Farm for the handling of casualty claims relating to Katrina.

In their answer to Renfroe's complaint, Moran and Rigsby admit that while employed by Renfroe, they executed documents

bearing the title "Employment Agreement" and "Code of Conduct", but they deny that these contracts were in effect during their work for Renfroe in the aftermath of Katrina. They take the position that each disaster started a new and distinct term of employment with Renfroe, and that they executed no separate Employment Agreement or Code of Conduct before beginning their work on Katrina. Without having been able to ask Moran or Rigsby at trial how they arrived at their belief that they were not bound by the terms of the Employment Agreement and the Code of Conduct relied upon by Renfroe, the court is left with the documents themselves and with the surrounding circumstances, including the explanatory testimony of Jana Renfroe, the officer of Renfroe who testified at the hearing on November 21. The court would have reached the conclusion it now reaches without the explanation provided by Ms. Renfroe.

The Employment Agreement signed by each defendant and applicable to each defendant during the time period here relevant, provided, *inter alia*:

* * *

> 6.  ***Non-Disclosure and Non-Solicitation.***  The Employee acknowledges that RENFROE has excelled in its efforts to maintain and develop good will with customers and in its efforts to develop new products, programs, services and marketing approaches, which satisfy its current and prospective customers and business partners. The Employee further recognizes that in order to retain the competitive advantage, which results from these efforts, the information concerning certain business affairs of RENFROE must be held in the strictest of confidence by employees and former

2

employees.  Therefore, In consideration for employment with RENFROE, the Employee further agrees as follows:

(a)  <u>Confidential Information</u>.  In the course of employment, the Employee will become privy to confidential information of RENFROE, its clients and their customers. During employment and for a two year period after termination of employment with RENFROE, Employee will not disclose or misappropriate any confidential information of RENFROE, its clients or their customers for the Employee's own use or for the use of any other corporation, partnership, firm or entity, except as the President of RENFROE expressly authorizes.  Confidential information includes data and information relating to the business of RENFROE and its clients which is or has been disclosed to the Employee or which the Employee became aware as a consequence of or through employment with RENFROE and which has value to RENFROE or its clients but is not generally known to the public.  Confidential information further includes any information which is or has been disclosed to the Employee or which the Employee became aware as a consequence of or through employment with RENFROE from or pertaining to the customers of RENFROE's clients. Confidential information shall not include any data or information that has been voluntarily disclosed to the public by RENFROE, its clients or their customers, except where such disclosure has been made by the Employee in an unauthorized manner, or that has been independently developed and disclosed by others, or that otherwise enters the public domain through lawful means.  For purposes of this Agreement, misappropriate means disclosing or using for any purpose other than fulfilling the Employee's responsibilities to RENFROE.

(b)  <u>Trademark/Servicemark</u>.  The Employee agrees not to disclose or otherwise identify RENFROE, its clients and their customers, or use the Trademark/Servicemark of RENFROE, its clients and their customers, in any unauthorized way, including, but not limited to the advertisement or endorsement of particular products or services.

(c)  <u>Ownership and accessibility</u>.  Employee understands and agrees that all records, files, claim draft information and other documentation of any kind obtained or created relating to claims made on RENFROE's clients, as well as any information obtained from or pertaining to the customers of RENFROE's clients, in connection with any assignment duties,

are the property of the client. Employee agrees that, upon request, RENFROE or its clients shall have immediate access to all such property. Employee understands and agrees that all other confidential information as described in paragraph 6(a) is the property of RENFROE, Employee agrees that, upon request, RENFROE shall have immediate access to all such property. Employee further agrees that all other property provided to the Employee for use on an assignment by either RENFROE or its clients, including but not limited to manuals, forms, records, identifying clothing and decals, shall remain the property of the provided, whether or not return of the property is requested.

(d) <u>Trade Secrets</u>. Employee understands that he or she may create or obtain information qualifying as a trade secret as defined under applicable state law. RENFROE and its clients retain exclusive ownership rights to any such trade secrets. Employee agrees that so long as any such information retains its character as a legal trade secret, Employee will not misappropriate, disclose, publish or use such information, without the express authorization of the President of RENFROE.

(e) <u>Return of Records and Documents</u>. At any time requested or immediately upon cessation of employment or association with RENFROE, Employee will return all physical or electronic records, documents or other materials and all copies of any records, documents or other materials containing, comprising or relating to the confidential information, trade secrets or other information of RENFROE its clients or their customers, which Employee creates or obtains at any time during employment with RENFROE.

(f) <u>Return of Other Property</u>. At any time requested or immediately upon cessation of employment or association with RENFROE, Employee will return all other property provided to the Employee for use on an assignment.

(g) <u>Assignment of Proprietary Rights</u>. The Employee further covenants and agrees that all right, title, and interest in any improvement, discovery or development related to work performed for RENFROE ("Developed Information"), whether conceived during or after normal working hours, shall be and remain the exclusive property of RENFROE. The Employee agrees immediately to disclose to RENFROE all unique, confidential and proprietary information conceived, developed, designed, devised or created, modified or improved by the Employee in connection with work

4

performed for RENFROE, and to assign to RENFROE any right, title and interest in the Developed Information. The Employee agrees to execute any instruments and to do all things reasonably requested by RENFROE, both during and after the employment period, to vest RENFROE with all ownership rights in the Developed Information. If any Developed Information can be protected by copyrights (I) as to that Developed Information which falls within the definition of "work made for hire" as defined in 17 U.S.C. Sec. 101, the copyright to such Development Information shall be owned solely, completely and exclusively by RENFROE, and (ii) as to that Developed Information which does not constitute "work made for hire," the copyright to such Developed Information shall be deemed to be assigned and transferred completely and exclusively by the Employee to RENFROE.

   7.   **Acknowledgment.**  The Employee has carefully read and reviewed the restrictions set forth in this Agreement, and having done so, agrees that the restrictions are fair and reasonable and are reasonably required for the protection of the legitimate business interests of RENFROE and its clients, as well as the personal interests of the customers of RENFROE's clients.

   8.   **Equitable Relief.**  The Employee recognizes and acknowledges that if a breach of the provisions of Section 6 of this Agreement occurs, damages to RENFROE would be difficult, if not impossible, to ascertain.  Because of the immediate and irreparable damage and loss that may be caused to RENFROE for which it would have no adequate remedy, it is therefore agreed that RENFROE, in addition to and without limiting any other remedy or right it may have, shall be entitled to an injunction or other equitable relief in a court of competent jurisdiction, enjoining any such breach.  The Employee hereby waives any and all defenses on the grounds of competence of a court to grant such an injunction or other equitable relief.  The existence of this right shall not preclude the applicability or exercise of any other rights and remedies at law or in equity, which RENFROE may have.

The Code of Conduct signed by each defendant and applicable to each defendant during the time period here relevant, provided, *inter alia*:

RENFROE expects employees to conduct the business of RENFROE in an ethical and legal manner, and to recognize that in all their transactions and at all times they have a duty of undivided loyalty to RENFROE, our clients, and their customers. These obligations demand positive action by all employees to protect those interests and to avoid situations where their self-interests actually or even appear to conflict with the interests of RENFROE, our clients and their customers.

This Code is intended to guide employees on ethical and legal standards of business conduct.

RENFROE and its employees must comply with this Code and all laws and policies applicable to the business of RENFROE. This Code does not attempt to cover every situation and there may be exceptions to the rule. If you have questions about a particular situation or believe others are not adhering to the Code, the law or policies, contact Gene or Jana Renfroe. Each of us must be willing to raise ethical and legal concerns. No one will be penalized for reporting in good faith a suspected violation or questioning a Company practice.

* * *

RENFROE employees should respond to inquiries about RENFROE, our clients and their customers only if give the authority to do so. Media contact and public discussion concerning RENFROE, our clients and their customers must be conducted only through authorized spokespersons.

* * *

In the course of conducting RENFROE business, RENFROE employees must protect the assets of RENFROE, our clients and their customers from unauthorized or improper use.

CONFIDENTIAL AND TRADE SECRET INFORMATION: RENFROE employees must protect from disclosure or misappropriation confidential and trade secret information developed or owned by RENFROE, our clients and their customers and vendors that they may become privy to in the course of conducting RENFROE business. This obligation is defined further in the agreement executed by individuals as a condition of being offered employment by RENFROE.

COMPUTER AND DATA SECURITY: RENFROE employees are

6

responsible for protecting from misuse, loss, and unauthorized access and disclosure the computers and data of RENFROE and our clients. RENFROE databases are the property of RENFROE, to be used for Company purposes only. Client computers and databases are the property of the client, to be used only for the purposes of carrying out the assigned duties of the project.

* * *

COMMUNICATIONS POLICY: The electronic information resources and telephonic communication systems of RENFROE and our clients should be used only for business-related purposes. Electronic information resources include: internet, e-mail, intranet, and fax machines. Telephone communication systems include: voice mail, telephones, and cellular phones. RENFROE reserves the right and will access and review the form and content of messages. The review will include accessing equipment and supplies furnished by RENFROE and our clients.

PHYSICAL AND INTANGIBLE PROPERTY: In the course of conducting RENFROE business, RENFROE employees must protect from loss, non-business use, misuse or damage the physical property of RENFROE, our clients and their customers. The use and reproduction of articles, books, and videotapes must be consistent with intellectual property laws.

* * *

**CONFLICTS OF INTEREST**

Employees must affirmatively protect the interests of RENFROE, our clients and their customers by avoiding conflicts of interest, both in appearance and in fact, and must not use their positions or knowledge of decisions or considerations of RENFROE, our clients or their customers in any manner that conflicts with or otherwise prejudices those interests.

While engaged in work on Katrina as Renfroe employees on behalf of State Farm, Moran and Rigsby learned of acts and practices of State Farm employees that the two defendants concluded were inappropriate and/or illegal. Instead of sharing

7

their concerns in this regard with Renfroe, Moran and Rigsby clandestinely copied approximately 15,000 confidential documents off of State Farm's computer and turned them over to The Scruggs Law Firm ("Scruggs"). As stated in their answer to Renfroe's complaint **"upon advice of counsel** [presumably Scruggs], they [Moran and Rigsby] provided certain documents to the FBI and the Mississippi Attorney General". (emphasis supplied). Renfroe became aware of Moran's and Rigsby's activities by seeing its two employees and Scruggs on the "20/20" television show, during which Scruggs, Moran and Rigsby all accused State Farm of egregious misconduct, and revealed to the general public the existence of State Farm records that allegedly prove that State Farm committed fraud on its policyholders. The program showed at least one document that bore the Renfroe logo. Moran and Rigsby never formally resigned, but it became apparent that their relationship with Renfroe came to an end when they appeared on "20/20". Their departure triggered the two-year time period during which their contracts with Renfroe precluded them from revealing confidential information. Renfroe demanded that Moran and Rigsby return all materials they had copied. Receiving no response, this action was filed.

    Besides denying that the Employment Agreement and the Code of Conduct signed by each of them was applicable during the Mississippi operation, the defense offered by Moran and Rigsby is

that they were discharging their duties as citizens when they cooperated with law enforcement officials.  Renfroe was never given the opportunity to evaluate the client information that Moran and Rigsby shared with Scruggs and thereafter with law enforcement.  No one can know with any degree of certainty what Renfroe's reaction and course of action would have been had the purloined information been shared with it.  Without knowing the precise terms of the relationship between Scruggs and the two defendants, it is apparent that they are all three now engaged in a cooperative effort.  Scruggs has filed one or more lawsuits against State Farm, claiming fraud against policyholders.  The attachments to one of Scruggs's fraud complaints against State Farm looks very much like items from a State Farm investigative file, like documents accessed and copied by Moran and Rigsby.

    Faced with the inalterable facts, Renfroe says that it will accept as a reasonable condition to its obtaining the requested materials, the entry of a protective order that will preclude its sharing with State Farm, or with any third party, materials it recovers from Moran and Rigsby.  The Attorney General of Mississippi was allowed to intervene for the limited purpose of seeking a stay of the hearing of November 21.  His stated reason was that for Renfroe to recover the materials would compromise the integrity of his ongoing criminal investigation.  The stay was denied, and the injunction hearing was held.

**The Four Grounds Necessary for the Granting of
a Preliminary Injunction**

There are four prerequisites to the granting of preliminary injunctive relief.  They will be discussed in the order in which they are usually addressed by courts who evaluate applications for preliminary injunction.

1.  Does Renfroe have a substantial likelihood of success on the merits?  The only doubt the court has in answering this question is expressed with a question: "How do we get the cat back in the bag"?  There can be no doubt that Moran and Rigsby violated important and critical terms of their contracts with Renfroe when they copied State Farm's records and turned them over to Scruggs.  Nothing could be more plain than Renfroe's need to protect its clients' information.  What a permanent injunction will accomplish that a preliminary injunction will not accomplish is speculative.  This is why the court suggested to the parties the collapsing of the preliminary injunction hearing into the hearing on the prayer for permanent injunctive relief using Rule 65(a)(2), F.R.Civ.P., but the court got no where with its said suggestion.  Nevertheless, because the court finds no legal excuse for defendants' violating their employment agreements in the name of the public interest in helping with law enforcement, the court finds a very high degree of likelihood that Renfroe will succeed in obtaining a permanent injunction when the final judgment is entered.  Therefore, there is a substantial

likelihood of success.

2. Will Renfroe suffer irreparable injury if an injunction is not issued? Moran and Rigsby argue with some degree of persuasiveness that because "the cat is already out of the bag", any damage has already been done, and therefore there can be no irreparable injury. They point out that Renfroe has failed to prove a single cancellation of a business opportunity traceable to the conduct of Moran and Rigsby. There are several problems with defendants' argument. First, without an injunction Moran and Rigsby can continue to engage in the public criticism of Renfroe's most important client, and with impunity they can share State Farm's internal records with lawyers and other persons outside of the law enforcement community. Considering the clear and meaningful confidential relationship that exists between Renfroe and its insurance clients, nothing could be more potentially harmful to Renfroe than a breach of the duty to keep its clients' confidential records confidential. After all, Moran and Rigsby expressly acknowledged in writing the virtual impossibility of quantifying the damages that would be caused by a breach of confidentiality, and expressly recognized and authorized the remedy of a preliminary injunction as appropriate. Monetary damages, in theory, are not only difficult to prove, but are woefully inadequate as a means of addressing the problems created for Renfroe by these defendants.

     3.    Will an injunction hurt defendants more than it will hurt plaintiff?  To foreclose Moran and Rigsby from further revealing and commenting upon Renfroe's and State Farm's confidential material for a period of two years from the termination of their employment relationship may interfere with their working relationship with Scruggs, but such is the kind of harm they expressly expected if they breached their confidentiality agreement, and the harm to Renfroe far outweighs any such harm to Moran and Rigsby.

     4.    Will a preliminary injunction, if properly limited, be so adverse to the public interest as to preclude it?  The Attorney General of Mississippi joins Moran and Rigsby in suggesting that the sky will fall if defendants are required to disgorge the State Farm records they copied and shared with Scruggs and/or with law enforcement.  As yet, there is no evidence as to whether all of the records the defendants shared with Scruggs were also shared with law enforcement.  As this court expressly noted when it denied the stay that was requested by the Attorney General, the court has found no authority binding on it, and has been cited none, that would interrupt civil litigation merely because of a pending criminal investigation, that is, unless a civil defendant invokes the Fifth Amendment privilege against self-incrimination.  No such invocation has taken place here.  Renfroe is not seeking, and cannot seek, an

order that would require the Attorney General of Mississippi or any other law enforcement agency, to share with Renfroe or anyone else any of its investigative materials, no matter where they came from.  Rather, Renfroe seeks to enforce its right to obtain from its own former employees the materials they misappropriated, and, as a condition, it is willing to accept a protective order to keep away from the eyes of third parties what it recovers from Moran and Rigsby.  There is no overriding public interest to prevent the issuance of a preliminary injunction under these circumstances.

## Preliminary Injunction

In accordance with the above finding of fact and conclusions of law, and in compliance with Rule 65(d), F.R.Civ.P., the application of plaintiff, E.A. Renfroe & Company, Inc., for a preliminary injunction is GRANTED, and defendants, Cori Rigsby Moran and Kerri Rigsby, and their agents, servants, employees, attorneys, and other persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise (**with the express exception of law enforcement officials**) are hereby MANDATORILY ENJOINED to deliver forthwith to counsel for plaintiff all documents, whether originals or copies, of each document and tangible thing, in any form or medium, that either of defendants or anyone acting in conjunction with or at the request or instruction of either of

them, downloaded, copied took or transferred from the premises, files, records or systems of Renfroe or of any of its clients, including, but not limited to State Farm Insurance Company and which refer or relate to any insurance claims involving damages caused or alleged to have been caused by Hurricane Katrina in the State of Mississippi.

    Defendants and their agents, servants, employees, attorneys, and other persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are further ENJOINED not to further disclose, use or misappropriate any material described in the preceding paragraph unless to law enforcement officials at their request.

    This preliminary injunction shall become effective upon the posting by plaintiff of an injunction bond in the amount of fifty Thousand Dollars ($50,000), to assure the payment of such costs and damages as may be suffered by defendants or entities found to have been wrongfully enjoined.  The said bond shall be in a form, and with a corporate surety, approved by the Clerk.

### Protective Order

    Because the documents and information in the possession or control of defendants and/or their agents are, or may be, relevant to the ongoing criminal investigation by the Attorney General of Mississippi, the court finds that there is a compelling interest in protecting the use and disclosures of

those certain documents and information to anyone except those needing the information for the criminal investigation or for the preparation of the above-entitled case for trial.  Therefore, plaintiff's counsel shall not disclose to any entity, including E.A. Renfroe & Company, any of the material delivered to them pursuant to this mandatory injunction without first obtaining the express written approval of this court after an *in camera* inspection by the court.  All documents shall be kept by plaintiff's counsel under lock and key.  No copies shall be made and the contents thereof shall not be revealed to anyone except Jack E. Held, Barbara Ellis Stanley and J. Rushton McClees, plaintiffs' counsel who have formally appeared .  The material shall be for their eyes only unless and until express authorization of the court is sought and obtained.

    DONE this 8th day of December, 2006.

                                        /s/ Walter M. Acker
                                        _____
                                        WILLIAM M. ACKER, JR.
                                        UNITED STATES DISTRICT JUDGE