IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

E.A. RENFROE & COMPANY, INC.,  }
                               }
      Plaintiff,               }
                               }        CIVIL ACTION NO.
v.                             }        06-AR-1752-S
                               }
CORI RIGSBY MORAN, et al.,     }
                               }
      Defendants.              }

**<u>MEMORANDUM OPINION</u>**

On January 19, 2007, the court ordered defendants Cori Rigsby Moran ("Cori Rigsby") and Kerri Rigsby, who are sisters, and non-parties Richard F. Scruggs and the Scruggs Law Firm (together, "Scruggs"), to show cause why they should not be held in contempt of court.  Plaintiff, E.A. Renfroe & Company, Inc. ("Renfroe"), maintains that the Rigsbys and Scruggs should be held in contempt for failing to comply with the preliminary injunction entered in the above-entitled action on December 8, 2006.  Upon consideration and review of the evidence and of the arguments of the parties, the court will decline to impose civil contempt sanctions as an enforcement tool against either the Rigsbys or Scruggs, but will leave the door open to a consideration of Renfroe's request for compensatory contempt sanctions after the Eleventh Circuit decides upon the validity of the preliminary injunction.  Meanwhile, however, the court will refer Scruggs to the United States Attorney for the Northern District of Alabama for prosecution for criminal contempt.  The court will decline to refer Cory Rigsby or Kerri

Rigsby for criminal contempt proceedings.

*Background*

The Rigsbys are former employees of Renfroe, a company that provides support services to insurance companies during times of disaster.  One of Renfroe's most important clients, if not the most important client, is State Farm Insurance Company ("State Farm"). The Rigsbys were employees of Renfroe after Hurricane Katrina devastated many coastal areas of the United States in August 2005, and they worked on behalf of State Farm as claims adjusters in Mississippi during Katrina's aftermath.  Among their duties as claims adjusters was to assist in the processing and evaluation of insurance claims submitted by owners of damaged or destroyed property.

While adjusting claims in Mississippi, the Rigsbys witnessed what they believed to be fraudulent practices by State Farm vis-à-vis its policy holders.  In early 2006, the Rigsbys began to photocopy documents that they thought contained evidence of egregious misconduct by State Farm.  In February 2006, they retained Scruggs, a private attorney in Mississippi, to act as their lawyer.  Tr. of March 19-20, 2007 Contempt Hr'g (herein, "March 19-20 Hr'g Tr.") (Doc. No. 130), at 133:15-23.  The attorney-client relationship between the Rigsbys and Scruggs still existed as of March 19-20, 2007, when the Rigsbys and Scruggs testified in the contempt hearing held by this court.  *Id.*  Scruggs

is not, and never has been, an attorney of record in this case. Scruggs was determined to be subject to the jurisdiction of this court in the memorandum opinion that accompanied the court's January 19, 2007 show-cause order.

Renfroe and the Rigsbys agree that the Rigsbys delivered to Scruggs documents that they had copied in four distinct "batches." The Rigsbys produced the first batch to Scruggs in February 2006. *Id.*, at 100:15-18.   They delivered a second batch of copies, consisting of emails, engineering reports, and other miscellaneous documents, to Scruggs and to other lawyers in April 2006.  *Id.*, at 100:22 — 101:5.  They did not retain any copies of either of these first two batches.  *Id.*, at 100:19-21; 101:6-7; 107:17-21.  During the weekend of June 3-4, 2006, the Rigsbys printed several thousand pages from an electronic database stored on State Farm's computers. *Id.*, at 101:9 — 103:10.  Using photocopy machines, the Rigsbys made two additional sets of these "data dump" documents.  *Id.*, at 106:19 — 107:10.  On June 5, 2006, the Rigsbys provided one set of the data-dump documents to Mississippi Attorney General Jim Hood ("Hood") and another set to the FBI.  *Id.*, at 107:19 — 108:4; 109:1-12. In July 2006, defendants became paid consultants for the Scruggs Katrina Group, a team of Mississippi lawyers headed by Scruggs that joined together soon after Hurricane Katrina to pursue claims against insurers, including State Farm.  *Id.*, at 114:10-17. The Rigsbys stored the third and final set of the data-dump

documents at a friend's house until they delivered it to Scruggs on or about August 1, 2006.  *Id.*, at 109:19 — 110:11.  The Rigsbys delivered a fourth batch of documents, consisting of a small number of training aids and miscellaneous documents that Cori Rigsby found while cleaning out her home office, to Scruggs in the fall of 2006. *Id.*, at 118:23 — 119:25.  The documents in batch four predated Katrina and did not contain any claims-related information.  *Id.* Scruggs subsequently shared the documents that defendants delivered to him with other members of the Scruggs Katrina Group.  *Id.*, at 175:16 — 176:3.

The documents brought to Scruggs by the Rigsbys are the focus of this lawsuit and the related contempt proceedings.  Renfroe filed the action on September 1, 2006, seeking injunctive relief and monetary damages.  In its amended complaint, Renfroe alleges that "[d]efendants have admitted that they copied approximately 15,000 pages of claims information and provided them to a plaintiff's lawyer [Scruggs] who is a friend of their mother. Defendants provided these many pages of claims-related information to this plaintiff's lawyer and his firm knowing that this lawyer had filed or was preparing to file civil lawsuits against insurance companies including Renfroe's clients."  The Rigsbys responded that "[a]fter seeing insurance company documents that Defendants believed to reflect criminal fraud, Defendants provided such documents to their lawyer — someone they had known for many years.

4

Upon advice of counsel, Defendants provided those documents to the FBI and to the Mississippi Attorney General." The Rigsbys's counsel in this case indicated during the March 19-20, 2007 contempt hearing that "[t]he sum total of those three copies was 15,000 pages of documents, approximately. Five thousand each, approximately," and that "there's been just a huge misunderstanding in the number of documents copied on that data dump weekend . . . ." March 19-20 Hr'g Tr., at 19:24 — 20:4. Cori Rigsby testified that she was "guessing that the total amount [of documents copied] was right around 15,000, and that would be all three sets of copies." *Id.*, at 39:5-5. Cori Rigsby further testified that she "believed" that each of the three identical sets of documents filled two complete and one partial box of copy-machine paper, so that all three sets together filled six complete and three partial boxes. *Id.*, at 39:19 — 41:20. The Rigsbys had earlier appeared on the television program *20/20*, where a reporter stated that the Rigsbys had "downloaded thousands of documents from State Farm computer files." Nov. 21, 2006 Prelim. Inj. Hr'g, Pla.'s Ex. 6. In an AP article that was published on August 26, 2006, news reporter Michael Kunzelman wrote that "[t]he sisters [Cori Rigsby and Kerri Rigsby] say they ultimately printed out and copied roughly 15,000 pages of claims records." *See* Pla.'s Mot for Prelim. Inj., Ex. E (Doc. No. 30-6). Cori Rigsby clarified during the contempt hearing that this 15,000 figure consisted of the sum

total of all three identical sets.  March 19-20 Hr'g Tr., at 45:9-
11; 107:7-10.

On December 8, 2006, the court entered a preliminary
injunction and protective order.  That injunction and order, which
took effect when Renfroe posted an injunction bond on December 11,
2006, stated:

### Preliminary Injunction

[D]efendants, Cori Rigsby Moran and Kerri Rigsby, and
their agents, servants, employees, attorneys, and other
persons in active concert or participation with them who
receive actual notice of this order by personal service
or otherwise (**with the express exception of law
enforcement officials**) are hereby MANDATORILY ENJOINED to
deliver forthwith to counsel for plaintiffs all
documents, whether originals or copies, of each document
and tangible thing, in any form or medium, that either of
the defendants or anyone acting in conjunction with or at
the request or instruction of either of them, downloaded,
copied took or transferred from the premises, files,
records or systems of Renfroe or of any of its clients,
including, but not limited to State Farm Insurance
Company and which refer or relate to any insurance claims
involving damages caused or alleged to have been caused
by Hurricane Katrina in the State of Mississippi.

Defendants and their agents, servants, employees,
attorneys, and other persons in active concert or
participation with them who receive actual notice of this
order by personal service or otherwise, are further
ENJOINED not to further disclose, use or misappropriate
any material described in the preceding paragraph unless
to law enforcement officials at their request.

This injunction shall become effective upon the posting
by plaintiff of an injunction bond in the amount of
$50,000 for the payment of such costs and damages as may
be suffered by defendants or any persons found to have
been wrongfully enjoined.  The said bond shall be in a
form, and with a corporate surety, approved by the Clerk.

### Protective Order

> Because the documents and information in the possession
> or control of defendants and/or their agent or, or may
> be, relevant to an ongoing criminal investigation by the
> Attorney General of Mississippi, the court finds that
> there is a compelling interest in protecting the use and
> disclosures of those certain documents and information to
> anyone not needing that information for the criminal
> investigation or for preparation of the above-entitled
> case.  Therefore, plaintiff's counsel shall not disclose
> to State Farm or any of its agents, including E.A.
> Renfroe & Company, Inc., any of the material delivered to
> them pursuant to the mandatory injunction without first
> obtaining the express written approval of the court after
> *in camera* inspection.  The documents shall be kept by
> counsel for plaintiff in a separate, locked location, and
> no copies shall be made and the contents thereof shall
> not be revealed without express authorization of the
> court.

(emphasis in original).  Defendants filed a motion to stay enforcement of the injunction on December 15, 2006.  The court denied defendants' motion on December 18, 2006.

Although Scruggs does not appear as an attorney of record for either of the Rigsbys in the instant action, there is no dispute about the fact that Scruggs was an attorney for the Rigsbys in relation to the subject of the documents when the injunction was issued.  *Id.*, at 133:15-23.  Scruggs is not a named party in this action, but he received notice of the injunction the day the court entered it.  *Id.*, at 188:25 — 189:4.  Scruggs spoke to Hood over the phone about the injunction that night.  *Id.*, at 192:17 — 193:2.  Scruggs testified that Hood interpreted the injunction to permit Scruggs to send him the documents rather than to counsel for Renfroe, and Scruggs did not disagree with Hood's erroneous interpretation.  *Id.*, at 195:14-20.

7

On December 12, 2006, Special Assistant Attorney General Courtney Schloemer, of Hood's office, sent a letter to Scruggs indicating that she is "not comfortable that the protective measures put in place by the Court will be effective in keeping these documents out of the grasp of State Farm," and requesting that Scruggs send the set of documents acquired by the Rigsbys to Hood's office. *Id.*, at 200:15 — 201:1; *See* Scruggs's Mot. to Dismiss or Quash, Ex. 2 (Doc. No. 79-3). Schloemer's letter was a followup to the conversation that Scruggs had with Hood on December 8, 2007. March 19-20 March 19-20 Hr'g Tr., at 202:18-20. Scruggs received the letter via email the same day Schloemer sent it. *Id.*, at 202:24 — 203:4. Scruggs sent the documents to Hood via Federal Express later that day. *Id.*, at 166:21-23; 202:14-20; 203:10-16. The Rigsbys's present counsel spoke to Scruggs about the injunction after it was entered but before Scruggs sent the documents to Hood, but Scruggs does not recall whether or not he revealed during that conversation that he intended to send the documents to Hood in order to place the documents outside the purview of the injunction. *Id.*, at 229:16 — 230:19. At the direction of her present counsel, Cori Rigsby contacted Scruggs on or shortly after December 12, 2006 for the purpose of making arrangements to obtain the documents and deliver them to Renfroe's counsel as ordered. *Id.*, at 222:6-10. Scruggs informed Cori Rigsby at this time that the documents had been sent to Hood, and that he no longer had possession of them.

8

*Id.*

Renfroe wrote to the Rigsbys on December 14, 2006, demanding return the purloined documents in compliance with the injunction. *See* Pla.'s Mot. for Contempt of Court, Ex. 2 (Doc. No. 68-4). The Rigsbys told Renfroe on December 21, 2006 that they no longer had the documents because they had turned them over to Scruggs, although Scruggs had told them several days prior that he had sent them to Hood. *See id.*, Ex. 5 (Doc. No. 68-8). Renfroe wrote to the Rigsbys and to Scruggs on December 28, 2006, again demanding return of the documents. *See id.*, Ex. 4 (Doc. No. 68-6). The Rigsbys responded on January 3, 2007 by informing Renfroe that Scruggs had sent the documents to Hood. *See id.*, Ex. 7 (Doc. No. 68-9). On January 27, 2007, Don Barrett, a member of the Scruggs Katrina Group, called counsel for Renfroe and offered to turn over additional documents as part of a settlement offer. *See* Pla.'s Second Supplement to Mot. for Defs. to Show Cause (Doc. No. 91-1) and accompanying exhibits.

On January 5, 2007, Renfroe filed a motion for an order to show cause why defendants and Scruggs should not be held in civil contempt for failing to abide by the terms of the injunction. The court granted that motion on January 19, 2007, and called upon the Rigsbys and Scruggs to show cause. On February 1 2007, Hood sent to Renfroe's counsel the documents that Scruggs had sent to him on December 12, 2006, and the documents were delivered on February 2,

2007.  *See* Pla.'s Br in Support of Mot. for Scruggs to Show Cause, Ex. B (Doc. No. 129-2).  After a contempt hearing on March 19-20, 2007, Renfroe's counsel left this third set of documents with the court.  As the court informed the parties in an order entered on March 28, 2007, that set consisted of the following, plus several compact discs ostensibly containing complete or partial copies in electronic format:

**First/Second/Fourth Batches (Non-Data-Dump Documents)**

- **6** complete, multi-page "documents," consisting of **262** total pages.

- **1** complete duplicate set of **two** of the above multi-page documents, consisting of **222** total pages.

- **5** partial duplicate sets of **the same two** multi-page documents, with each partial duplicate set consisting of **24** pages, for a total of **120** pages.

**Third Batch (Data-Dump Documents)**

- **853** or **2559** documents, depending on what is considered one "document" (each data-dump "claim" consists of three parts, and each individual part might be thought of as one "document"), consisting of **6,538** total pages.  **219** of these pages are duplicates of other pages within this set.

- **1** complete duplicate of **148** or **444** documents (depending on what is considered one "document," as explained above), consisting of **1,220** total pages.

**Total number of pages in the two boxes ostensibly containing one complete set of data-dump documents:**

- **6,538** pages, **219** of which are duplicate copies of documents within the complete set.  There are

10

therefore **6,319** (6,538 - 219) unique pages within this set.

**Total number of pages provided to Renfroe as of March 28, 2007:**

- 262 + 222 + 120 + 6,538 + 1,220 = **8,362** total pages.

On or about April 18, 2007, Renfroe received an additional 1520 pages of documents from Jason L. Nabors.  Renfroe had subpoenaed these documents from attorneys Nabors and Richard T. Phillips.  *See* Pla.'s Br. in Supp. of Mot. for Civil Contempt (Doc. No. 128-1), at 4-5.  For aught appearing, Nabors, Phillips, and/or Phillips's law firm are members of or work with the Scruggs Katrina Group.  The documents sent by Nabors constitute a copied subset of the 6,319 unique data-dump documents that Hood had sent to Renfroe on February 1, 2007.

Scruggs sent a letter to Hood on March 23, 2007 requesting that Hood send him "copies of all State Farm documents that your office voluntarily provided E.A. Renfroe last month."  Pla.'s Br in Support of Mot. for Scruggs to Show Cause, Ex. B (Doc. No. 129-3).  Hood refused Scruggs's request.  *See* Scruggs's Reply Br. on Pla.'s Mot. for Contempt (Doc. No. 138), at 4 n.2.

At some point after the preliminary injunction took effect, a television commercial for the Scruggs Katrina Group featuring Kerri Rigsby began airing in areas affected by Hurricane Katrina.  *See* Pla.'s Supplement to its Br. in Supp. of Mot. for Scruggs to Show Cause (Doc. No. 131-1) and accompanying exhibits.  In the ad, Kerri

Rigsby says:

> If I were you I wouldn't expect to find any good news
> from my insurance company in here [nodding towards the
> mailbox]. Even after their tactics of delay, deceit and
> denial, the insurance companies are asking you to come to
> mediation even after they were caught shredding documents
> subpoenaed by the grand jury and changing engineering
> reports, they still expect you to trust them. This
> mediation is a sweetheart deal between the Insurance
> Commissioner and insurance companies. It's rigged
> against you. How do I know? I'm Kerri Rigsby and I used
> to work for State Farm. I know firsthand how far they
> will go to avoid paying your claim. Take it from me you
> need a lawyer not the Insurance Commissioner's mediation
> program. Think twice before you believe what you find
> here [nodding towards the mailbox]. Check with a lawyer
> and make sure you get a fair settlement. Don't give in
> to mediation. Don't give in to big insurance.

*Id.*

### *Analysis*

### Civil Contempt

Civil contempt may serve two purposes. It "can be either coercive, which is intended to make the recalcitrant party comply, or compensatory, which reimburses the injured party for the losses and expenses incurred because of his adversary's noncompliance . . . ." *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529 (11th Cir. 1986) (citations omitted); *see also Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1304 (11th Cir. 1991) ("The court has the power to impose coercive and compensatory sanctions"). Renfroe seeks the imposition of both forms of sanctions.

The court believes that whether it should impose civil

contempt sanctions that are compensatory in nature is a premature inquiry.  Such sanctions, if the court imposed them, would stand only if the underlying preliminary injunction is valid.  *See U.S. v. Koblitz*, 803 F.2d 1523, 1527 (11th Cir. 1986).  As the parties are aware, the Rigsbys have appealed the preliminary injunction, and that appeal is still pending in the Eleventh Circuit.  If the Eleventh Circuit vacates the preliminary injunction, compensatory sanctions would be unwarranted.

The court recognizes that Renfroe has made several efforts to obtain all of the purloined documents, and that Renfroe did not initiate contempt proceedings in an effort to enforce the injunction until after it learned that Scruggs had taken action to avoid it.  Rather than to rule definitively on whether Renfroe was effectively forced to bring contempt proceedings and should be compensated for the time and resources it spent in enforcing the injunction, the court will pass these questions for the time being, and will not take them up until the Eleventh Circuit rules upon the validity of the preliminary injunction.

In order for the court to impose **coercive** civil contempt sanctions, Renfroe must show by clear and convincing evidence that the December 8, 2006 preliminary injunction **currently** is being violated.  *See United States v. Money*, 744 F.2d 779, 780 (11th Cir. 1984); *see also Reynolds v. McInnes*, 338 F.3d 1201, 1211 (11th Cir. 2003) (explaining that "plaintiffs would have had the burden of

13

proving by clear and convincing evidence what they allege in their motion" for contempt); *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002) ("A finding of civil contempt . . . must be supported by clear and convincing evidence"). In order to meet its burden, Renfroe relies upon the number of pages of documents it received from Hood versus the number of documents defendants have said that they copied. This evidence does not meet the clear-and-convincing threshold necessary for imposition of coercive sanctions. The court is left to speculate about whether all documents have been returned.

Renfroe focuses on the fact that it received 6,319 unique data-dump pages from Hood, and it juxtaposes this fact with its contention that the Rigsbys have routinely admitted that they copied 15,000 documents during the data-dump weekend of June 3-4, 2006. The Rigsbys did not expressly admit to the 15,000-pages figure in their answer to Renfroe's amended complaint. Renfroe says that the Rigsbys told a reporter on *20/20* that they copied 15,000 documents, but the transcript of that television program reveals only that the Rigsbys "downloaded thousands of documents." Neither defendant was under oath when one or both of them evidently told reporter Michael Kunzelman that they had "printed out and copied roughly 15,000 pages of claims records."

Cori Rigsby acknowledged during the contempt hearing that she and Kerri Rigsby made approximately 15,000 copies during the data

14

dump.  She explained, however, that this figure referred to all of the pages from each of the three identical sets of documents, so that each individual set actually consisted of approximately 5,000 documents.  The court can understand how it might be reasonable to characterize 6,319 as "approximately" 5,000, or 18,957 (6,319 x 3) as "approximately" 15,000.  If a person wanted to use round numbers, saying that 18,957 is "approximately 20,000" would be more accurate than saying "approximately 15,000," but the Rigsbys have never claimed to have known the exact number of pages they printed or copied on June 3 and 4, 2006.  They just copied everything they could get their hands on.

Renfroe also points to the number of boxes of paper in which defendants stored the copied documents.  Cori Rigsby testified that the 15,000-pages estimate was "based on the number of . . . boxes of paper that [she] purchased," an estimate she made after she had "quickly counted the boxes."  March 19-20 Hr'g Tr., at 106:24 — 107:5.  The parties agree that one unopened box of standard computer paper contains 5,000 sheets, so Cori Rigsby evidently saw three boxes when she "quickly counted" them.  But then how did defendants make the remaining 3,957 (6,319 x 3 - 15,000) or 4,614 (6,538 x 3 - 15,000) copies?  Maybe Cori Rigsby actually bought four boxes of paper but only saw three boxes when she counted. Maybe there was extra paper laying around at the copy center where defendants made the copies, and they used this extra paper in

15

addition to that which they had purchased.  The court is puzzled at how one set of 6,319 or 6,538 data-dump documents could, as Cori Rigsby testified, fill two complete boxes and one partial box when each box originally contained 5,000 sheets of paper, but this court's puzzlement falls short of establishing by clear and convincing evidence that defendants are still harboring and secreting copies of documents.

The court agrees with Renfroe's tacitly stated sentiment that defendants' telling the media that they copied approximately 15,000 pages of allegedly fraud-evincing documents, when this estimated page count actually consisted of three identical sets of approximately 5,000 pages each, was, at best, misleading.  It might very well be true that the "huge misunderstanding in the number of documents copied on that data dump weekend" is a misunderstanding that was created entirely by the Rigsbys's own actions and statements.  That the Rigsbys may willingly have promoted sensationalistic journalism does not establish the propriety of imposing the coercive sanctions upon them.  There is no point in imposing a coercive sanction on a party to make her do something she cannot do.  The court is not satisfied that the Rigsbys are willfully violating the requirement to return all documents.  Whether they violated a duty to their former employer by misleading the public will be a matter to be decided as part of the trial on the merits.  It may be relevant to some aspects of Renfroe's claim,

but it is not relevant to the issue of coercive sanctions.  The bottom line is that defendants and Scruggs testified that they no longer have any Renfroe or State Farm documents, and Renfroe has not presented evidence that clearly and convincingly refutes these assertions.

In addition to page-count discrepancies, Renfroe says that Scruggs must not be complying with the injunction because copies of data-dump documents continue to "dribble in" from various members of the Scruggs Katrina Group.  Scruggs says that he has "made an effort" to get individuals with whom he shared the documents to return them.  March 19-20, at 175:16 — 176:3.  He does not provide any details behind this effort.  "A party under court order to produce documents has a duty to make in good faith all reasonable efforts to comply."  *U.S. v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984).  If Scruggs has been lackadaisical in his attempts to retrieve copies of the documents that he shared with other individuals, that issue can be adequately addressed if and when Renfroe renews its request for compensatory sanctions.  Renfroe's contention that documents have been "dribbling in" does not establish by clear and convincing evidence that there are still more documents "out on the street."  The court therefore will not order the Rigsbys and Scruggs "to account for the numbers of copies, paper and electronic, that have been made from [the] unique documents" that defendants copied, as Renfroe requests.  *See* Pla.'s

17

Br. in Supp. of Mot. for Civil Contempt (Doc. No. 128-1), at 9. The court instead will leave it to Renfroe to attempt to acquire such an accounting through the discovery process, to the extent it is relevant to the remaining issues.

### Criminal Contempt

"The role of criminal contempt is to protect the institutions of our government and enforce their mandates.  A federal court may impose criminal sanctions pursuant to 18 U.S.C. § 401 (1982),[1] to vindicate its authority and safeguard it own processes." *In re McDonald*, 819 F.2d 1020, 1023-24 (11th Cir. 1987) (citations omitted).  The Eleventh Circuit went on to explain:

> The essential elements of criminal contempt are that the court entered a lawful order of reasonable specificity, it was violated, and the violation was willful.  Whether the order is reasonably specific is a question of fact and must be evaluated in the context in which it is entered and the audience to which it is addressed.  In criminal contempt, willfulness means a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of an order.  Each of these elements must be proven beyond a reasonable doubt in order to determine guilt and impose punishment.

---

[1] 18 U.S.C. § 401 states:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as-

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

*Id.* at 1024 (citations omitted).

The court finds that there exists sufficient evidence to meet the burden of proving that Scruggs willfully violated the court's December 8, 2006 preliminary injunction, and that referral to a prosecutor is the appropriate course to take to vindicate the court's authority. There is no dispute that Scruggs became aware of the preliminary injunction the day it was issued. That injunction required him, as an attorney or agent of defendants, to deliver forthwith to Renfroe's counsel "all documents . . . that either of the defendants . . . downloaded, copied took or transferred from the premises, files, records or systems of Renfroe or of any of its clients . . . which refer or relate to any insurance claims involving damages caused or alleged to have been caused by Hurricane Katrina in the State of Mississippi." It is undisputed that Scruggs had in his possession the exact documents that fell within the scope of the injunction and that were and are the whole subject of the controversy. Instead of complying, Scruggs promptly sent the documents to Hood for the calculated purpose of ensuring noncompliance with or avoidance of the injunction's clear first paragraph. Scruggs's motive seems clear from the undisputed facts. Even after Hood "voluntarily" sent the documents to counsel for Renfroe at Scruggs's request, Scruggs wrote to Hood requesting another copy of the same documents for himself and ostensibly for the Scruggs Katrina Group. Scruggs is

an experienced attorney and an officer of the court.  His brazen disregard of the court's preliminary injunction is precisely the type of conduct that criminal contempt sanctions were designed to address.

Scruggs argues that he did not violate the injunction because the injunction, as he interprets it, contains an express carve-out for law enforcement.  To read the preliminary injunction to permit Scruggs to deliver the documents to Hood rather than to counsel for Renfroe is such a strained construction and so contrary to the injunction's clear terms as to lack any credibility whatsoever.  It unduly blurs the distinction between the injunction's first and second paragraphs.  It deems the words "disclose," "use," and "misappropriate" in the second paragraph to be synonymous with the word "deliver," even though "deliver" is the word that the court carefully chose for the first paragraph.  Moreover, Schloemer's December 12, 2006 letter, which Scruggs says was a followup to his December 8, 2006 conversation with Hood, states that Hood's office was "not comfortable that the protective measures put in place by the Court will be effective in keeping these documents out of the grasp of State Farm."  If Hood and Scruggs really thought that the injunction permitted Scruggs to do what he did, why did Hood believe that the protective measures in the injunction were insufficient?  If that truly was Hood's and Scruggs's interpretation, why did Hood not instead send a letter to Scruggs

requesting delivery of the documents "as expressly permitted by the protective measures built into the injunction"?  The substance of the December 12, 2006 followup letter from Hood's office is fundamentally at odds with Scruggs's testimony.

In the alternative, Scruggs argues that he was performing a public service by sending the documents to Hood instead of to counsel for Renfroe because he "had no doubt" that Renfroe's counsel would make the documents available to Renfroe or to State Farm, which in turn would interfere with Hood's criminal investigation of State Farm.  March 19-20 Hr'g Tr., at 198:3-11.  Taking Scruggs's word for it, he was arrogating to himself the right to substitute his judgment for the court's judgment.  That spells "defiance."  The court has two other reactions to Scruggs's argument, neither of which is particularly relevant to whether Scruggs violated the injunction, but reactions nevertheless.  First, the court very deliberately included a protective order in the preliminary injunction to ensure that the documents would be delivered to Renfroe's counsel only, not to Renfroe or to State Farm, rendering Scruggs's illusory concern unfounded.  Second, even if the court had not issued a protective order with the preliminary injunction, and even if Renfroe's counsel had promptly disclosed the documents to State Farm, the court does not understand how this would have jeopardized a criminal investigation of State Farm.  Unless, as Renfroe has hinted at, Scruggs and Hood had teamed up to

21

bully State Farm into civil and criminal settlements by telling State Farm that they had 15,000 inculpatory documents but not allowing State Farm to see them, the court does not see why it was worth it to Scruggs to risk contempt.  The database from which the documents were printed was still in the possession of Renfroe and/or State Farm.

Scruggs next argues, based on the following November 14, 2006 colloquy between the court and Renfroe's counsel, that Renfroe consented to his delivery of the documents to Hood:

> The Court: So you are willing to stipulate that the defendants' sharing of private information to a criminal investigation is not a violation of any obligation that they owe to the plaintiff?

> Ms. Stanley: Renfroe stipulates that the giving of information and documents to a government investigator conducting any kind of investigation is not a violation of their contract.

> The Court: All right.  And would not be either a contractual violation or a tort?

> Ms. Stanley: Agreed.

> The Court: Or a violation of any fiduciary obligation arising out of the relationship?

> Ms. Stanley: Agreed.

This colloquy took place shortly before the court issued the preliminary injunction.  It does not establish that Renfroe consented to Scruggs's delivery of the documents to Hood one month later, after the injunction was issued.  And even if it did prove consent, Renfroe is not in a position to consent to noncompliance

with this court's orders.

Scruggs consistently emphasizes that he reserves his contention that he is not subject to the preliminary injunction and/or to the jurisdiction of this court.  On this subject the court maintains the position it expressed in its memorandum opinion of January 19, 2007.  Scruggs testified that he became defendants' attorney in February 2006, and the later-entered preliminary injunction expressly applied to defendants' agents and attorneys.  Application of the injunction to Scruggs as an attorney of defendants is entirely consistent with the scope of injunctions as described in Rule 65(d), Fed. R. Civ. P.  The case *Doctor's Associates, Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, (2d Cir. 1999), to which Scruggs repeatedly refers to argue that he is not subject to the preliminary injunction (and which is not binding on this court) is clearly distinguishable for this reason in addition to the reasons expressed in the court's January 19, 2007 memorandum opinion.

With respect to the Rigsbys themselves, the court does not believe that there is evidence to prove that either of them engaged in conduct that constitutes a basis for punitive or criminal sanctions.  They could be in criminal contempt only if held vicariously liable as agents or confederates of Scruggs.  They certainly were not the brains of the injunction-avoidance schemes. After they gave the documents to Scruggs they were, in effect,

23

controlled by him.  Perhaps the Rigsbys ought to have been more proactive and taken more immediate action when the injunction was issued.  Perhaps they should have done more than to make one or two phone calls to Scruggs.  Perhaps their present counsel should have affirmatively demanded that Scruggs promptly return the documents when he spoke to Scruggs between December 8, 2006 and December 12, 2006.  All of these considerations may be relevant if and when the court evaluates whether defendants' efforts were reasonable for purposes of considering compensatory civil contempt sanctions.  *See United States v. Roberts*, 858 F.2d 698 (11th Cir. 1988).  But the fact remains that the Rigsbys themselves did not have possession of the documents on or after December 8, 2006, and this should preclude a jury finding that they knowingly or willfully violated the terms of the preliminary injunction.

Renfroe argues that Scruggs Katrina Group member Don Barrett's offer to provide additional documents to Renfroe, and the Scruggs Katrina Group television advertisement featuring Kerri Rigsby, constitute further evidence of contumacious conduct that calls for punitive sanctions.  The court disagrees.  There is no evidence that the documents Barrett offered "refer or relate to any insurance claims involving damages caused or alleged to have been caused by Hurricane Katrina in the State of Mississippi" and therefore fall within the scope of the injunction.  The television advertisement, in which Kerri Rigsby says that she "know[s]

firsthand how far [insurance companies] will go to avoid paying your claim," does not constitute disclosure, use, or misappropriation of any documents covered by the injunction. Moreover, the television ad does not appear to compromise or even implicate Renfroe or State Farm trade-secret information, which is, of course, the centerpiece of this lawsuit.

*Conclusion*

The court will not at this time impose civil contempt sanctions against defendants or against Scruggs.  It will permit Renfroe to renew its request for compensatory sanctions after the Eleventh Circuit determines the validity of the December 8, 2006 preliminary injunction.  Because the court will not now impose civil sanctions, the Rigsbys's and Scruggs's motions to strike certain evidentiary submissions filed by Renfroe will be deemed moot, except to the extent that they are directed at evidence in connection with the referral of Scruggs for criminal contempt proceedings, as to which defendants' motion to strike will be denied.  The court will not refer Cori Rigsby or Kerri Rigsby for prosecution for criminal contempt.

In accordance with Rule 42(a), Fed. R. Crim. P., the court will formally request that an attorney for the government prosecute Scruggs's contempt.  If the government declines this request, the court will appoint another attorney to prosecute the contempt. Because in the context of criminal contempt proceedings the

25

undersigned has acted as the functional equivalent of a grand jury for finding probable cause, he will have the criminal contempt proceedings against Scruggs reassigned to another judge.

DONE this 15th day of June, 2007.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE


cc: Alice Martin
    United States Attorney's Office
    Northern District of Alabama